1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re:* TOYS "R" US – DELAWARE, INC. – FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACTA) LITIGATION | ) MDL No. CV 08-01980 MMM (FMOx) ) No. CV 06-08163 MMM (FMOx) ) No. CV 08-06645 MMM (FMOx) ) ) ORDER GRANTING PLAINTIFFS' ) MOTION FOR FINAL APPROVAL OF ) CLASS ACTION SETTLEMENT AND ) GRANTING MOTION FOR INCENTIVE ) AWARDS ) ) ) |

On December 21, 2006, Nicola Edwards and James Schley filed an action against Toys "R" Us ("Toys"), alleging that it had violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.[1]   Specifically, plaintiffs asserted that Toys had violated the Fair and Accurate Credit Transactions Act ("FACTA"), which requires that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or the transaction." 15 U.S.C. § 1681c(g).  Plaintiffs sued on behalf of a class of consumers who received receipts from Toys that did not comply with FACTA  (the "*Edwards* plaintiffs").

---

[1]Complaint ("Edwards Complaint"), CV 06-08163 MMM (FMOx),  Docket No. 1 (Dec. 21, 2006).

On May 21, 2008, Gregory J. Ellis filed a similar action in the Northern District of Illinois, which was assigned to Judge William T. Hart.[2]  Like Edwards and Schley, Ellis sought to represent a class of consumers who received a receipt from Toys that did not comply with FACTA (the "*Ellis* plaintiffs").  On October 9, 2008, the United States Judicial Panel on Multidistrict Litigation transferred the *Ellis* action to this court for consolidated pretrial proceedings.[3]

On March 8, 2010, the *Ellis* and *Edwards* plaintiffs filed separate motions for class certification.[4]  Toys separately opposed the motions on April 5, 2010.[5]  On August 17, 2010, the court denied the motions for class certification.[6]  Three days later, the parties filed a stipulation to stay the case pending decision by the Ninth Circuit of *Bateman. v American Multi-Cinema, Inc*, 623 F.3d 708 (9th Cir. 2010).[7]  Following decision of *Bateman*, the parties requested a further stay so that they could mediate the actions.[8]  The stay was lifted on August 3, 2011.[9]

In its order lifting the stay, the court directed the parties to meet and confer and file a joint

---

[2]Complaint ("Ellis Complaint"), CV 08-6645 MMM (FMOx), Docket No. 3 (May 21, 2008).

[3]Transfer Order,  CV 08-6645 MMM (FMOx), Docket No. 1 (Oct. 9, 2008).

[4]Plaintiff's Motion for Class Certification ("Ellis Cert. Motion"), MDL 08-1980 MMM (FMOx), Docket No. 43 (Mar. 8, 2010); Edwards' Motion for Class Certification ("Edwards Cert. Motion"), MDL 08-1980 MMM (FMOx), Docket No. 45 (Mar. 8, 2010).  All future docket numbers refer to MDL 08-1980 MMM (FMOx) unless otherwise specifically noted.

[5]Toys "R" Us' Opposition to Plaintiffs Nicola Edwards' and James Schley's Motion for Class Certification ("Edwards Opp."), Docket No. 52 (Apr. 5, 2010); Toys "R" Us' Opposition to Plaintiff Gregory J. Ellis' Motion for Class Certification ("Ellis Opp."), Docket No. 54 (Apr. 5, 2010).

[6]Order Denying Class Certification ("Class Cert. Order"), Docket No. 100 (Aug. 17, 2010).

[7]Stipulation to Stay Case Pending Decision by Ninth Circuit in *Bateman v. AMC*, Docket No. 101 (Aug. 20, 2010).

[8]Stipulation to Stay Case Pending Mediation, Docket No. 106 (Dec. 27, 2010).

[9]Order Lifting Stay; Setting Scheduling Conference; Directing Parties to File Joint Report Addressing Specific Questions, Docket No. 110 (Aug. 3, 2011).

report setting forth their respective positions as to whether the court should certify a class or classes following the Ninth Circuit's decision in *Bateman*.[10]   On January 11, 2013, the court granted plaintiffs' renewed motion for class certification.[11]   Toys filed an interlocutory appeal in the Ninth Circuit.

On February 19, 2013, the parties advised the court that they had reached a settlement.[12] On March 18, 2013, the Ninth Circuit stayed Toys' petition for interlocutory appeal pending the outcome of settlement approval in the district court.[13]   Plaintiffs filed a motion for preliminary approval of the settlement agreement on May 13, 2013,[14] which the court approved on June 6, 2013.[15]   The court set a final approval hearing for November 4, 2013 at 10:00 a.m.[16]  On August 9, 2013, plaintiffs filed a motion for attorneys' fees.[17]   On October 7, 2013, they filed a motion for final approval of the settlement.[18]   Toys has not opposed either motion.

---

[10]*Id.*

[11]Order Granting Plaintiff's Motion for Class Certification ("Second Class Cert. Order"), Docket No. 133 (Jan. 11, 2013).

[12]Notice of Settlement, Docket No. 139 (Feb. 19, 2013).

[13]Order from 9th Circuit Court of Appeals ("9th Cir. Order"), Docket No. 140 (Mar. 18, 2013).

[14]Motion for Preliminary Approval of Settlement Agreement ("Prelim. Approval Motion"), Docket No. 142 (May 13, 2013).

[15]Order of Preliminary Approval ("Prelim. Approval Order"), Docket No. 144 (June 6, 2013).

[16]*Id.*, ¶ 9.

[17]Motion for Attorneys' Fees ("Fees Motion"), Docket No. 146 (Aug. 9, 2013).

[18]Motion for Final Settlement Approval ("Motion"), Docket No. 150 (Oct. 7, 2013).

# I. FACTUAL BACKGROUND

### A.    The *Edwards* and *Ellis* Cases

Both the *Edwards* and *Ellis* actions involve a period of time in 2006 during which Toys printed more than the last four digits of consumers' credit card numbers on its customer receipts. The court found the following facts undisputed in deciding a motion for summary judgment in *Edwards*:

For seven years prior to 2006, Toys collaborated with NCR Corporation ("NCR") to implement upgrades to its cash register software. *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1203 (C.D. Cal. 2007).  NCR is an outside consultant that works closely with Toys – so closely that NCR has stationed one of its employees in Toys' offices to assist with software issues. *Id.* By the middle of 2005, all of the cash register systems in Toys' stores were programmed to print only the last four digits of debit and credit card numbers and to omit card expiration dates on electronically printed customer receipts. *Id.*  Beginning in mid-2006, Toys initiated a plan to truncate card numbers on internal corporate displays so that only the first six and last four digits of customer card numbers were visible. *Id.*  The internal displays included "call info chits" used internally for customer service purposes. *Id.*[19]  A team of NCR and Toys personnel developed an appropriate software upgrade to modify the internal displays and generated a change request ("CR").  Toys then engaged NCR to develop the software and implement the upgrade.   NCR completed its work by October 27, 2006. *Id.* at 1204.

In the process of upgrading Toys' cash register software to truncate the credit and debit card information shown on internal displays, Jeanette Lee, an NCR employee who worked exclusively from Toys' main office, revised the CR to state that "all guest receipts [would] also contain the same masking of the first 6 and the last 4 digits." *Id.*  By making this revision, Lee effectively added information to external customer receipts that had been previously suppressed.

---

[19]Call info chits are documents printed by customer service personnel when a credit or debit card transaction is denied; the chits are not provided to the customer and are used strictly for internal purposes.   FACTA's requirement that no more than five numbers be printed on a customer receipt is applicable only to external receipts produced for customers. *Id.* at 1203 n. 13.

Before implementing the software modification, Lee contacted two Toys employees and requested approval to apply the change to all receipts. On August 24, 2006, Toys' Point of Sale Systems team held a meeting; the minutes of this meeting state: "CR-615, this is the CR which masks the credit card on the referral chit. . . . The same masking change will also be used on other guest receipts." *Id.*

Although the software was tested both by NCR and Toys' user acceptance group, the receipts generated by the new software were never compared with the original conforming receipts. Beginning in late October 2007, the software change was implemented and caused more than the last five digits of customer credit and debit card numbers to appear on more than 29 million printed customer receipts. *Id.* at 1204–05.

On December 27, 2007, Toys received a copy of the *Edwards* complaint. Toys promptly took action to cure the violation. It assembled a team to run tests on cash registers, which confirmed that the registers were printing more than the last four digits of customers' card numbers. The team developed and implemented a software change to correct the problem; by January 5, 2008, all of Toys' cash registers nationwide had been brought into compliance with FACTA. *Id.* at 1205.

After considering the motion for summary judgment in *Edwards*, the court found that there were disputed issues of fact that precluded granting the motion.[20] Six months after the court decided the *Edwards* summary judgment motion, the *Ellis* action was filed in the Northern District of Illinois. Five months later, the U.S. Judicial Panel on Multidistrict Litigation consolidated the two actions for pretrial purposes. *In re: Toys "R" Us-Delaware, Inc., Fair and Accurate Credit Transactions Act (FACTA) Litigation*, 581 F.Supp.2d 1377 (U.S. Jud. Pan. Mult. Lit. 2008). The

---

[20]These issues were: (1) whether Lee could be characterized as Toy's agent and thus whether her intent could be imputed to Toys; (2) whether Lee communicated and whether Toys' employees understood that her proposed change would affect customer as opposed to internal receipts; (3) whether the change to customer receipts was discussed during the weekly Point of Sale Systems meeting; and (4) whether knowledge should be imputed to Toys given that test receipts generated prior to implementation displayed ten digits of customers' credit card numbers. *Id.* at 1205–07.

panel concluded that "[e]ach action involves allegations that defendant's printing of certain credit and debit card information on customer receipts violated the Fair and Accurate Credit Transactions Act." *Id.* at 1377.

As noted, on March 8, 2010, Edwards and Ellis filed separate motions to certify a class of consumers who shopped at Toys and had more than four digits printed on their credit card receipt. Edwards sought to certify a class of

> "[a]ll consumers to whom, after December 3, 2006, Defendant provided an electronically printed receipt at the point of a sale or transaction in California, on which receipt Defendant printed more than the last five digits of the person's credit or debit card number (the "California Class")."

Ellis sought to certify a class of

> "[a]ll persons in the United States, except California, to whom Defendant provided an electronically-printed receipt at the point of a sale or transaction from October 27, 2006 through January 5, 2007 and which receipt displayed more than the last five digits of the purchaser's credit card or debit card number (the "Nationwide Class").[21]

The court declined to certify the classes, finding that a class action was not a superior vehicle for resolving plaintiffs' disputes.[22] It noted that no putative class member had alleged any actual injury,[23] and concluded, based on the evidence adduced, that the printing of the first six digits, in addition to the last four, caused no actual harm to putative class members and resulted in a negligible increased risk of harm.[24] As a consequence, the court found that the range of the

---

[21]Ellis Cert. Motion at 12-13. The *Edwards* and *Ellis* plaintiffs also sought to certify subclasses of consumers at single stores in Culver City, California and Schaumburg, Illinois, respectively.

[22]Class Cert. Order at 32-33.

[23]*Id.* at 22.

[24]*Id.* at 25.

possible statutory damages award – $2.9 to $29 billion – was disproportionate to the actual harm caused.  After the Ninth Circuit decision in *Bateman*, however, which held that the proportionality between statutory and actual damages was not an appropriate basis upon which to deny class certification, 623 F.3d at 721, the court reconsidered the motions for class certification and following *Bateman*, found that each of the superiority factors was satisfied and that it was proper to certify classes.[25]

## B.   The Certified Classes

The court certified two classes:[26]

(1)   *Edwards'* California Class: "All consumers to whom, after December 3, 2006, Toys provided an electronically printed receipt at the point of a sale or transaction in California, which contained more than the last five digits of the person's credit or debit card number."

(2)   *Ellis'* Nationwide Class: "All persons in the United States, except California, to whom Toys provided an electronically-printed receipt at the point of a sale or transaction from October 27, 2006 through January 5, 2007, which displayed more than the last five digits of the purchaser's credit card or debit card number."[27]

## C.   The Settlement Agreement

### 1.   Settlement Negotiations

The parties contend negotiations were conducted at arms length and were not the result of collusion.[28]  They state that they engaged in extensive mediation, including multiple sessions before retired federal judges and a settlement conference with the court.[29]  Settlement discussions

---

[25]Second Cert. Order at 28.

[26]*Id*. at 49-50.

[27]*Id*.

[28]*Id*.; Prelim. Approval Motion, Exh. 1 (Settlement Agreement at 4).

[29]Motion at 8.

commenced in July 2009.[30]  When the parties reported that these negotiations had been "fruitless," the court directed that they engage in private mediation.[31]  The parties did so on December 3, 2009; retired District Judge Gary Taylor served as the mediator.[32]  They planned to attend another mediation facilitated by Judge Taylor on January 25, 2011, but Toys informed plaintiffs it would not attend.[33]  Thereafter, the parties mediated in May 2011 before the Honorable David H. Coar, a retired Northern District of Illinois judge; they were once again unable to come to a settlement.[34]  On September 12, 2012, the court conducted a third mediation that, like the first two, was unsuccessful.[35]  After the court granted plaintiffs' motions for class certification, the parties negotiated a fourth time and reached a tentative settlement.[36]  The parties report that they agreed on the relief the class would receive before they negotiated attorneys' fees.[37]

### 2.      The Terms of the Settlement Agreement

The settlement class is defined as "[a]ll persons who made purchases at any Toys 'R' Us store during the Class Period (defined as the period from December 4, 2006 through January 5, 2007, inclusive) using credit or debit cards."[38]  Under the settlement agreement, class members agree to release Toys from any and all claims they have against it.[39]  In exchange for this release, class members who submit a claim form by the claims deadline to Toys 'R' Us will get vouchers

---

[30]Status Report Re: Completion of Mediation, Docket No. 22 (Dec. 7, 2009) at 1.

[31]Minutes of Further Scheduling Conference, Docket No. 17 (Sept. 14, 2009).

[32]Status Report Re: Completion of Mediation at 2.

[33]Joint Case Management Status Report, Docket No. 108 (Feb. 8, 2011), at 2-3.

[34]Joint Status Report, Docket No. 116 (Aug. 22, 2011), at 5.

[35]Minutes of Settlement Conference, Docket No. 126 (Sept. 12, 2012).

[36]Notice of Tentative Settlement at 1-2.

[37]Settlement Agreement, ¶ 2.6.

[38]Settlement Agreement, ¶ 1.11.

[39]*Id.*, ¶ 3.19.

8

for $5 to $30, which are transferrable and valid for six months after their issuance for use at Toys 'R' Us stores.[40]  Class members who attest, under penalty of perjury that to the best of their knowledge, they made one or more credit/debit purchases at a Toys store during the class period will receive a $5 voucher.  Class members who document one or two credit/debit purchases at a Toys store during the class period will receive a $15 voucher, while class members who document three credit/debit purchases at a Toys store during the class period will receive two $15 vouchers.[41]

The settlement agreement provides that Toys will not object to a $5,000 incentive award for each of the three named plaintiffs.[42]  The named plaintiffs did not have to approve the terms of the settlement to receive an incentive award.  In the agreement, Toys also agrees that it will not object to a request for attorneys' fees and costs that does not exceed $525,000.00.[43]  The settlement agreement proposed, and the court approved, notice to the class via publication in USA Today on July 9 and 16, 2013 and on a website dedicated to the settlement and administered by a third-party settlement administrator, Class Action Administration, Inc., which was to go live at the same time.[44]

## II.  DISCUSSION

### A.    Whether the Court Should Finally Approve the Parties' Settlement

As noted, the court certified one class for settlement purposes.[45]  Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court "approve any settlement, voluntary

---

[40]*Id.*, ¶ 2.4.

[41]*Id.*, ¶ 2.4.1.

[42]*Id.*, ¶ 2.5.

[43]*Id.*, ¶ 2.6.

[44]Prelim. Approval Order, ¶ 4-5.

[45]*Id.*, ¶ 2.

dismissal, or compromise of the claims, issues, or defenses of a certified class." Approval under Rule 23(e) involves a two-step process "in which the [c]ourt first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *National Rural Telecommunications Cooperative v. DIRECTV, Inc.* ("*NRTC*"), 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.14, at 236-37 (1995)). The Ninth Circuit has noted that, in considering whether finally to approve a class settlement, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.* ("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, which encourage facilitating the settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation"), cert. denied, 459 U.S. 1217 (1983).

### 1.   Notice Requirements

Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs." FED.R.CIV.PROC. 23(e). The notice given must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that does not systematically leave an identifiable group without notice").

The court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and agreement. See *San Francisco NAACP v. San Francisco Unified School District*, 59 F.Supp.2d 1021, 1027 (N.D. Cal. 1999) ("The purpose of Rule 23(e) is to protect 'unnamed class members from unjust or unfair settlements

affecting their rights when the representatives become fainthearted before the action is adjudicated or are unable to secure satisfaction of the individual claims by a compromise,'" quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). One aspect of the court's role is to ensure that all class members receive adequate notice of the proposed settlement.

Because Toys does not have the mailing addresses of purchasers who used debit or credit cards during the class period, the court approved notice by means of publication and a settlement website. The parties published notice of the settlement in USA Today on July 9 and 16, 2013.[46] They also established a website dedicated to the settlement, located at www.ToysRUsReceiptSettlement.com, and administered by a third-party settlement administrator, Class Action Administration, Inc.[47] The website went live on or about July 8, 2013; as of October 3, 2013, it had been viewed approximately 9,309 times.[48]

When the court certifies a nationwide class of persons whose addresses are unknown, notice by publication is reasonable. See *Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *5-6 (S.D. Cal. Oct. 14, 2010); see also *In re Valdez*, 289 Fed. Appx. 204, 205-06 (9th Cir. Aug. 11, 2008) (Unpub. Disp.) ("[I]nstead of requiring individual notice to all class members who can be identified through reasonable effort, [R]ule 23(d)(2) provides only that notice be given 'in a manner as the court may direct.' The sufficiency of such notice is measured 'against the broader standards of due process.' . . . Newby has not shown that the district court's order, which required publication of the claims filing deadline in local newspapers for three consecutive weeks, violated due process," citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1126-27 (9th Cir. 1977)); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, No. 06-02069 SBA,

---

[46]Declaration of Publication of Class Notice, Docket No. 147 (Aug. 23, 2013), ¶ 2; Motion at 4, Exh. 1 (Declaration of Settlement Administrator in Support of Plaintiffs' Motion for Final Approval ("Dekdebrun Decl."), ¶¶ 3-4).

[47]Declaration of Publication of Class Notice ("Notice Decl."), Docket No. 147 (Aug. 23, 2013), ¶ 2; Motion at 4, Exh. 1 (Declaration of Settlement Administrator in Support of Plaintiffs' Motion for Final Approval ("Dekdebrun Decl."), ¶¶ 3-4, Exh. A (Settlement Website)).

[48]Dekdebrun Decl., ¶ 5.

2008 WL 1990806, *2 (N.D. Cal. May 5, 2008) ("[N]otice by publication is only used when the identity and location of class members cannot be determined through reasonable efforts"); *In re Tableware Antitrust Litigation*, 484 F.Supp.2d 1078, 1080 (N.D. Cal. 2007) ("Because defendants do not have a list of potential class members, the court agrees with plaintiffs that notice by publication is the only reasonable method of informing class members of the pending class action and the Lenox settlement").

The notice form published in USA Today and on the settlement website summarizes the action and the terms of the settlement, explains how class members can submit a claim form, notifies class members of their ability to opt-out of the settlement class or object to the settlement, and contains details regarding the final fairness hearing.[49] The notice clearly apprises class members of the action and of their legal options. Consequently, the court finds that unnamed class members had adequate notice of the settlement and adequate opportunity to file a valid claim form, opt out, or object to the settlement. The court therefore finds that the notice requirement of Rule 23(e) has been satisfied.

## 2.    Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy." *Vaughns v. Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998). The district court's role, in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties assert that the settlement is presumptively fair because it is the result of arms-

---

[49]See *id.*, Exh. A (Settlement Website); Notice Decl., Exh. B (USA Today Notice).

length negotiations that have been "extensive and contentious."[50]   As noted, the parties began settlement discussions in July 2009,[51] after which the court directed them to engage in private mediation.[52]  The parties did so on December 3, 2009, before Judge Taylor.[53]  They were to attend another mediation with Judge Taylor on January 25, 2011, but Toys informed plaintiffs that it would not attend.[54]  Thereafter, the parties mediated in May 2011 before Judge Coar; again they were unable to come to a settlement.[55]  On September 12, 2012, the court conducted a third mediation that, like the first two, was unsuccessful.[56]  After the court granted plaintiffs' motions for class certification, the parties mediated a fourth time and reached a tentative settlement.[57]  The parties report that they agreed on the relief the class would receive before they negotiated attorneys' fees.[58]

Having participated in one mediation between the parties, and considering the number of mediations held, the court concludes that the settlement is a product of informed, arms-length negotiations, and is therefore entitled to a presumption of fairness.  See *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution"); *NRTC*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir.

---

[50]Motion at 8; Prelim. Approval Motion at 9.

[51]Status Report Re: Completion of Mediation at 1.

[52]Minutes of Further Scheduling Conference.

[53]Status Report Re: Completion of Mediation at 2.

[54]Joint Case Management Status Report at 2-3.

[55]Joint Status Report at 5.

[56]Minutes of Settlement Conference.

[57]Notice of Tentative Settlement at 1-2.

[58]Settlement Agreement, ¶ 2.6.

13

1996)).   Nonetheless, the court must examine the terms of the settlement, considering relevant factors, to determine whether the settlement is indeed fair.   In making this assessment, the court balances:

> "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."   *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

This list of factors is not exclusive, "and different factors may predominate in different factual contexts." *Torrisi v. Tuscon Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).   See also *Churchill Village, L.L.C.*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007) (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the plaintiff in that process").

### a.   Strength of Plaintiffs' Case

FACTA provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction."   15 U.S.C. § 1681c(g)(1).   The FCRA creates a private right of action for violations of FACTA, see, e.g., *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059 (9th Cir. 2002); it provides

that plaintiffs can recover actual damages for negligent violations,[59] and actual or statutory damages, as well as punitive damages, for "willful" violations.[60]   Toys' main argument prior to settlement was that its violation of the statute was not willful.[61]   Indeed, that is the basis upon which it moved for summary judgment in the *Edwards* action.   In deciding that motion, the court had the opportunity to evaluate the sufficiency of the evidence of willfulness adduced.   It determined that plaintiffs had proffered uncontroverted evidence that Toys violated FACTA by printing more than the last 5 digits of a credit or debit card number on more than 29 million receipts.   The court denied summary judgment, however, because there were four disputed issues of fact relevant to the willfulness of Toys' conduct: (1) whether Lee could be characterized as Toy's agent and thus whether her intent could be imputed to Toys; (2) whether Lee communicated and whether Toys' employees understood that her proposed change would affect customer as well as internal receipts; (3) whether the change to customer receipts was discussed during the weekly Point of Sale Systems meeting; and (4) whether knowledge should be imputed to Toys given that test receipts generated prior to implementation of the change displayed ten digits of customers' credit card numbers.   *Id.* at 1205–07.

In short, the court concludes that while plaintiffs had demonstrated that Toys printed more than the last 5 digits of credit and debit card numbers on the receipts issued during the class

---

[59]See *id.*, § 1681o ("Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . any actual damages sustained by the consumer as a result of the failure; and . . . the costs of the action together with reasonable attorney's fees as determined by the court").

[60]See 15 U.S.C. § 1681n ("Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; . . . such amount of punitive damages as the court may allow; and . . . the costs of the action together with reasonable attorney's fees as determined by the court").

[61]See e.g., Motion for Summary Judgment, CV 06-08163 MMM (JCGx), Docket No. 30 (Apr. 6, 2007).

period, Toys had raised triable issues of fact as to whether plaintiffs could prove wilfulness.  The fact that there were triable issues as to willfulness, a required element of plaintiffs' request for statutory and punitive damages – the only type of damages plaintiffs sought – favors a finding that the settlement is fair.  See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) ("Factor (1), the strength of plaintiffs' case, somewhat favors settlement because plaintiffs' remaining claims are tenuous.  Plaintiffs assert that establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial'").  The court therefore concludes that this factor weighs in favor of final approval of the settlement.

### b.	The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The parties report that they conducted "extensive investigation and evaluation of the facts and law relating to the claims asserted in the Lawsuit."  They state that the "ultimate outcome in the Lawsuit [was] uncertain," and "recognize that achieving a final result through litigation would [have] require[d] substantial additional risk, discovery, time, and expense."[62]  It is certain that, had this case not been resolved through settlement, the balance of the litigation would have been protracted.  Toys, in fact, had already filed a petition for interlocutory review of the court's class certification order, which the Ninth Circuit stayed pending the court's consideration of the motion for final approval of the parties' settlement.[63]  Had the case proceeded, it is certain that the litigation would have been lengthy, given the filing of the appeal, and the history of the litigation to date.  It is also clear that, whatever the outcome of a trial, the losing party would have appealed.  As a result, this factor weighs in favor of approval.

Had the case continued, moreover, plaintiffs faced a substantial risk of incurring the expense of a trial without any recovery, as no one in the class alleged actual damages and the

---

[62]Settlement Agreement at 4.

[63]9th Cir. Order at 1.

16

court found that the risk of any future damage as a result of Toys' conduct was negligible. For its part, Toys risked the possibility of "catastrophic damages" of $2.9 billion, or 2,500% of its net worth.[64]  The fact that both sides faced this type of all-or-nothing prospect weighs in favor of approval.  As the court stated in *Glass v. UBS Financial Services, Inc.*, No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007):

> "In light of the above-referenced uncertainty in the law, the risk, expense, complexity, and likely duration of further litigation likewise favors the settlement. Regardless of how this Court might have ruled on the merits of the legal issues, the losing party likely would have appealed, and the parties would have faced the expense and uncertainty of litigating an appeal.  'The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement.'  See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 458 (9th Cir. 2000).  Here, the risk of further litigation is substantial." *Id.* at *4.

See also *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (in weighing the risk of future litigation, "a court may consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation" (internal quotation marks omitted)); *Young*, 2007 WL 951821 at *3 ("Because this litigation has terminated before the commencement of trial preparation, factor (2) also militates in favor of the settlement"); see also *Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of this settlement").

Because further litigation would have been protracted and likely have included one or more appeals, because both parties faced a real prospect that they would not prevail, and because the amount at stake was so large, this factor supports approval of the settlement.  See *In re Portal Software, Inc. Securities Litigation*, 2007 WL 4171210 at *3 (recognizing that the "inherent risks

---

[64]Second Cert. Order at 17.

of proceeding to . . . trial and appeal also support the settlement").

### c.   The Risk of Maintaining Class Action Status Throughout Trial

Whether or not the action would have been tried as a class action is also relevant in assessing the fairness of the settlement.  Here, as mentioned, the court first denied plaintiffs' motions for class certification; following *Bateman*, it reversed course and certified two classes, finding that the risk to Toys of "ruinous liability" did not mandate a finding that a class action was not a superior vehicle for resolving the dispute.[65]   Toys filed a petition for review of the certification decision in the Ninth Circuit; this indicates there was some risk of decertification because the *Bateman* court "reserve[d] judgment as to whether a showing of 'ruinous liability' would warrant denial of class certification in a FACTA or similar action."  623 F.3d at 722. Avoiding the risk of decertification, especially where there are doubts concerning the viability of the class, favors approval of the settlement.  See *McKenzie v. Federal Exp. Corp.*, No. CV 10–02420 GAF (PLAx), 2012 WL 2930201, *4 (C.D. Cal. July 2, 2012) ("[S]ettlement avoids all possible risk [of decertification].  This factor therefore weighs in favor of final approval of the settlement"); *Catala v. Resurgent Capital Services L.P.*, Civil No. 08cv2401 NLS, 2010 WL 2524158, *3(S.D. Cal. June 22, 2010) ("The avoidance of risk of maintaining class action certification throughout trial favors settlement of this action"); *Lane v. Facebook, Inc.*,No. C 08–3845 RS, 2010 WL 9013059, *4 (N.D. Cal. Mar. 17, 2010) ("The risk that a class action may be decertified at any time generally weighs in favor of approving a settlement," citing *Rodriguez*, 563 F.3d at 966.  Compare *Kim v. Space Pencil, Inc.*, No. C 11–03796 LB, 2012 WL 5948951, *5 (N.D. Cal. Nov. 28, 2012) ("[B]ased on the record presented, the court considers the risk of decertifying the class to be low.  This factor, therefore, weighs slightly against approving the Settlement Agreement").  Because there was a risk of decertification in this case, this factor too weighs in favor of granting the settlement.

### d.   The Amount Offered in Settlement

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and

---

[65]Second Cert. Order at 16-22.

avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)). Estimates of a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

As noted, Toys has agreed to give all class members who submit valid and timely claims during the claims period transferable vouchers ranging from $5 to $30 in value. Toys has approximately 7,000 items available for purchase under $5, and approximately 18,000 items available for purchase under $15.[66] While the vouchers have a cash value and can be used to purchase items for which class members would otherwise have to pay money, they are a form of non-monetary relief and must be carefully scrutinized. See FED.R.CIV.PROC. 23(2)(C)(h), Advisory Committee Note ("Settlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class").

Courts have approved the use of gift cards or coupons in lieu of monetary compensation in class action suits. See *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06–04149 MMM (SHx), 2008 WL 8150856, *6-7 (C.D. Cal. July 21, 2008) (approving the use of gift cards where they provided "significantly more than [each class member] would have earned had Victoria's Secret paid her for her work"); *Young*, 2007 WL 951821 at *4 (approving the use of gift cards in large part because they are transferrable; "this enables class members to obtain cash –

---

[66]Motion, Exh. 2 (Declaration of Clinton J. McCord in Support of Motion for Final Approval ("McCord Decl."), ¶ 2).

something all class members will find useful"); *States of New York and Maryland v. Nintendo of America, Inc.*, 775 F.Supp. 676, 681 (S.D.N.Y. 1991) (approving a settlement awarding each class member a five dollar coupon and noting that the coupons were fully transferrable and that "[c]ompensation in the form of coupons has been approved by other courts").

Although the precise number of class members remains uncertain, Toys issued 29 million receipts between October 27, 2006 and January 5, 2007, or approximately 2.9 million receipts per week. During the four and a half week class period, therefore, Toys issued an estimated 13.05 million receipts. Assuming there are 13.05 million class members,[67] if all were to submit timely, valid claims, the aggregate value of the relief to the settlement class would be between $65.25 million (assuming all class members received a $5 voucher) and $391.5 million (assuming all class members received a $30 voucher). This compares with a potential liability had the case gone to trial of between $1.305 billion and $13.05 billion. There is no indication, however, that a jury would have awarded each class member the maximum possible penalty. Moreover, the court noted in its class certification order that the potentially ruinous liability Toys faced was not sufficient to defeat a finding of superiority because "even if Toys ultimately faces the prospect of class action damages that would end its existence as a company, the court [could] reduce those damages at a later stage of the proceedings if it [found] them unconstitutionally excessive."[68]

Viewed from the perspective of each class member, had the class member sued Toys individually and proved that it acted wilfully, he or she could have recovered between $100 and $1,000 in statutory damages. 15 U.S.C. § 1681n. A $5 or $30 award, therefore, represents 5%

[67]This is unlikely, as the parties contemplate, in their settlement agreement, that some class members shopped at Toys multiple times during the class period. (See Motion at 4 n. 1; Settlement Agreement, ¶ 2.4.1.)

[68]Second Cert. Order at 22 ("An award that would be unconstitutionally excessive may be reduced, but constitutional limits are best applied after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure. Reducing recoveries by forcing everyone to litigate independently – so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims – has little to recommend it," citing *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006)).

to 30% of the recovery that might have been obtained.  This is not a *de minimis* amount.  Given the likelihood that plaintiffs would have been unable to prove actual damages and the risk that they would have been unable to prove willfulness and recover any damages at all, the court finds that the amount of the settlement weighs in favor of approval.  See, e.g., *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 459 (9th Cir. 2000) (holding that, given the difficulties inherent in complex litigation, a settlement that paid plaintiffs one-sixth of their potential recovery was fair and adequate); *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial").

> **e.      The Stage of the Proceedings and Extent of Discovery Completed**

"'The extent of discovery may be relevant in determining the adequacy of the parties' knowledge of the case.'"  *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995)).  "'A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'"  *Id*. (quoting 5 W. Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)).  The more the discovery completed, the more likely it is that the parties have "'a clear view of the strengths and weaknesses of their cases.'"  *Young*, 2007 WL 951821 at *4 (quoting *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

Class counsel state that they "obtained discovery necessary to confirm representations made by Toys in the context of settlement negotiations."[69]  They state that Toys produced "hundreds of thousands of documents,"[70] that they propounded multiple sets of written discovery and served

---

[69]Settlement Agreement at 4.

[70]Declaration of J. Mark Moore in Support of Motion for Attorneys' Fees ("Moore Fees Decl."), Docket No. 146-2 (Aug. 9, 2013), ¶ 3.

multiple subpoenas, and that they responded to discovery Toys propounded as well.[71]  Plaintiffs

deposed several Toys representatives and its expert,  and sat for depositions as well.[72]  The parties

had protracted discovery disputes that they litigated before the magistrate judge[73] and were still

pursuing discovery in February 2013.[74]  The parties have also engaged in heavy motion practice

since *Edwards* was first filed in 2006; they briefed and argued a motion for summary judgment,

and two motions for class certification, which required several rounds of supplemental briefing

regarding the effect of *Bateman* on the superiority analysis.[75]

In *Browning v. YahooA Inc.*, No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov.

16, 2007), the court found that a similar volume of discovery and the stage of the proceedings,

including multiple mediation sessions, weighed in favor of approving the settlement proposed in

that case.  *Id.* at *12 (finding that the extent of discovery and stage of the proceedings weighed

in favor of approving a settlement where the case had been pending three years, "involved

discovery and motion practice, including a motion to dismiss," and "the parties [had] engaged in

multiple rounds of mediation," and concluding that "[a]s a result [of these activities], the parties

and this Court are well positioned to assess the strength of this case and the comparative benefits

of the proposed settlement").  Here, too, the court concludes that the action is at a stage where

the parties have a "clear view of the strengths and weaknesses of their cases."  See *True v.*

---

[71]*Id.*

[72]*Id.*

[73]See e.g., Toys' Motion for Protective Order, Docket No. 28 (Jan. 27, 2010); Opposition to Motion for Protective Order, Docket No. 36 (Feb. 3, 2010); Edwards' Motion for Admissions by Toys, Docket No. 23 (Jan. 20, 2010); Motion to Compel Documents Responsive to Ellis' Second Request for Production of Documents, Docket No. 26 (Jan. 27, 2010); Opposition to Edwards' Motion for Admission, Docket No. 33 (Jan. 27, 2010); Opposition to Ellis' Motion to Compel Documents, Docket No. 39 (Feb. 3, 2010).

[74]Stipulation to Continue Deposition of Joel Tennenberg, Docket No. 136 (Jan. 29, 2013).

[75]See Toys' Motion for Summary Judgment, CV 06-0863 MMM (JCGx),Docket No. 30 (Apr. 6, 2007); Motion for Class Cert.; Supplemental Brief in Further Support of Class Certification, Docket No. 122 (Nov. 14, 2011).

*American Honda Motor Co.*, 749 F.Supp.2d 1052, 1078 (C.D. Cal. 2010) (finding, in a case
where "class counsel reviewed 'thousands of pages of relevant documents,'" that "discovery ha[d]
been sufficient to permit the parties to enter into a well-informed settlement, and this factor weighs
in favor of approval").   The court accordingly concludes that this factor also weighs in favor of
approving the settlement.

### f.    The Presence of a Governmental Participant

This factor does not apply because no government entity participated in the case.   This
factor is therefore neutral.

### g.    The Experience and Views of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of
reasonableness."   *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations
omitted).   "Parties represented by competent counsel are better positioned than courts to produce
a settlement that fairly reflects each party's expected outcome in litigation."   *In re Pacific
Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995).   In its order approving class
certification and appointing class counsel, the court found that class counsel were "qualified to
represent the interests of the respective classes."[76]   Class counsel assert that they are "skilled class
action attorneys who have the necessary skill and experience to litigate the nuances of a class
action FACTA case."[77]   Counsel report they "believe the proposed settlement is a fair, adequate
and reasonable one under all the circumstances."[78]   While the weight to be given to this factor is
tempered somewhat by counsel's "obvious pecuniary interest in seeing the settlement approved,"
*Young*, 2007 WL 951821 at *5, the court nonetheless concludes that counsel's views weigh in
favor of approving the settlement.   See *Fernandez*, 2008 WL 8150856 at *7 n. 32 ("While the
court agrees that this factor must be discounted to some degree in recognition of the personal

---

[76]Second Cert. Order at 44.

[77]Motion for Attorneys' Fees at 7.

[78]Declaration of J. Mark Moore in Support of Motion for Preliminary Approval ("Moore
Prelim. Decl."), Docket No. 142-1 (May 13, 2013), ¶ 5.

interest of class counsel in having the settlement approved, it declines to discount the well-considered views of counsel entirely").

### h.   Class Members' Reaction to the Proposed Settlement

Plaintiffs contend the settlement "will confer substantial benefit upon the Class," and that it is "in the best interests of the Class and is fair and reasonable."[79]   The fact that plaintiffs' incentive awards are not conditioned on their approval of the settlement,[80] but that they nonetheless approve the compromise, indicates that they consider the settlement fair.

In order to gauge the reaction of other class members, it is appropriate to evaluate the number of requests for exclusion, as well as the objections submitted.   See *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors," quoting *Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness")).

As noted, Toys issued an estimated 13.05 million receipts during the class period.   It is not likely this is the actual number of class members, however, as some class members probably made multiple purchases during that time.   Nonetheless, it is a virtual certainty that there are millions of class members.   While not all likely received notice of the settlement, it is probable that a substantial number did.   As of October 3, 2013, only one of the millions of class members – Gregg Harriger – had opted-out of the class.[81]   Assuming there are 13.05 million class members, this single opt-out represents .0000077% of the class.   Even if the court considers a class reduced by 25% to account for consumers who purchased goods from Toys multiple times during the class period, Harriger's single opt-out represents .00000010% of the class, an infinitesimally small number.   As of October 3, 2013, moreover, no class member had objected to the terms of the

---

[79]Settlement Agreement, ¶ 2.2.

[80]*Id.*, ¶ 2.5

[81]Dekdebrun Decl., ¶¶ 10-11.

settlement.[82]

The negligible number of opt-outs and objections indicates that the class generally approves of the settlement.  See *Churchill Village, L.L.C.*, 361 F.3d at 577 (affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received); see also *Rodriguez*, 563 F.3d at 967 ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent] submitted objections"); *Chun-Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 852 (N.D. Cal. 2010) (concluding, in a case where "[a] total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were made from the class of roughly three hundred and twenty-nine (329) members," that the reaction of the class "strongly supports settlement"); *Garner v. State Farm Mut. Auto Ins.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. Apr. 22, 2010) (finding that an opt-out rate of 0.4 percent supported "the fairness of the Settlement"); *Glass*, 2007 WL 221862 at *5 (approving a settlement where the opt-out rate was 2%); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (finding that an opt-out rate of .10614 percent and an objection rate of .0052 percent represented "overwhelming support" for the settlement by class members and that it was "strong circumstantial evidence supporting the fairness of the Settlement").  For this reason, the court finds that the class members' reaction weighs strongly in favor of approving the settlement.

### i.    Other Factors

As noted, the *Young* court considered two additional factors: the process by which settlement was achieved and the involvement of the named plaintiffs in the process.  The parties here reached agreement after intensive arms-length negotiations facilitated by three neutrals, including the court.  The court therefore finds that the process by which the settlement was reached weighs in favor of approving the settlement.

Class counsel state that all of the plaintiffs "took an active role in the litigation and

---

[82]*Id.*, ¶¶ 7-8.

settlement negotiations."[83]  They report that "[e]ach [ ] provided their respective ideas and input to Class Counsel in the rounds of negotiations and exchanges that preceded and followed that first mediation, including discussions leading up to the second mediation and . . . many discussions that followed.  Each also participated in the process [of] finaliz[ing] the written settlement terms and documents, and the post-agreement phases that followed."[84]  Counsel state that "Edwards and Schley . . . attended [the] mediation session before the Hon[orable] Gary Taylor,"[85] and that Ellis "participated in . . . efforts leading to settlement, and approved the amount and type of settlement proposed for the class."[86]  Given this information, the court concludes that plaintiffs were involved in the settlement negotiations and that this factor weighs in favor of approval.

### j.   Signs of Collusion

The Ninth Circuit has explained that, in addition to evaluating the fairness of the settlement terms, the district court should be watchful for "subtle signs" that class counsel and the class representatives permitted self-interest to trump their obligation to ensure a fair settlement for the class as a whole.  *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011).  In *Bluetooth*, the Ninth Circuit identified three possible signs of collusion:

"(1) when the settlement terms result in class counsel receiving a disproportionate share of the settlement, or when the class receives no monetary compensation but counsel receive an ample award of attorneys' fees;

(2) the presence of a clear sailing agreement that carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for . . . accepting an unfair settlement; and

(3) when the parties arrange for fees not awarded to revert to defendants, rather

---

[83]Prelim. Approval Motion at 13.

[84]Fees Motion at 12-13, citing Moore Fees Decl., ¶ 8; Doherty Decl., ¶ 9.

[85]Moore Fees Decl., ¶ 8.

[86]Declaration of Richard Doherty in Support of Motion for Attorneys' Fees ("Doherty Decl."), Docket No. 146-1 (Aug. 9, 2013).

than being paid into the class fund." *Id.* (citations and quotation marks omitted). The Ninth Circuit noted that this list is not exclusive, but offered it as guidance to lower courts regarding the type of provisions that require "greater scrutiny than ordinarily demanded" in assessing the overall fairness of the settlement. *Id.* at 949.

The third sign of collusion is absent in this case: the settlement agreement does not create a common fund and does not contain a reversion provision. As respects the first sign of collusion, it is difficult to determine the percentage relationship between the attorneys' fees sought and Toys' settlement liability[87] since it is unclear how many class members will submit valid claims. It does not appear, however, that the attorneys' fees sought will be nearly as disproportionate as was the fee award at issue in *In re Bluetooth*. There, "the amount awarded was 83.2% of the total amount defendants were willing to spend to settle the case." *Id.* at 945. The agreement here specifies that defendants will not object to a fees and cost award of $525,000 or less.[88] As noted, the court estimates that Toys' settlement liability is between $65.25 million and $391.5 million. Assuming the value of the settlement is $65.25 million, class counsel's requested fee of $457,993.54 represents .70% of the total value; the negotiated $525,000 cap equals .80%. Given the parties' inability to ensure that all class members received notice of the settlement, however, it is likely that the actual value of the vouchers Toys will distribute to class members will be much less than $65.25 million. If 315,000 people, which represents approximately 2% of the class, request $5 vouchers, for example, the attorneys' fees award sought would be approximately 30% of Toys' settlement liability; this is still significantly less than the 83% at issue in *Bluetooth*. While it is

---

[87]Where a settlement agreement provides for the distribution of transferrable vouchers that can be used to obtain free merchandise, courts treat the vouchers as having monetary value. In its analysis of the *Bluetooth* collusion factors, the court therefore considers whether "the settlement terms result in class counsel receiving a disproportionate share of the settlement," and does not treat this as a situation in which "the class receives no monetary compensation but counsel receive an ample award of attorneys' fees." See, e.g., *Foos v. Ann, Inc.*, Civil No. 11cv2794 L(MDD), 2013 WL 5352969, *2 (S.D. Cal. Sept. 24, 2013) ("A voucher is [ ] like a gift card or cash [because it has] an actual cash value, is freely transferable and does not require class members to spend additional money in order to realize the benefits of the settlement").

[88]Settlement Agreement, ¶ 2.6.

difficult to predict Toys' actual settlement liability, because it has committed to distribute vouchers
worth potentially millions to the class, and because attorneys' fees will not reduce the settlement
amount available to class members, the court concludes that the fee award to which the parties
agreed is not so disproportionate to the class's recovery that it suggests collusion.  Compare
*Harris v. Vector Marketing Corp.*, No. C–08–5198 EMC, 2011 WL 4831157, *6 (N.D. Cal. Oct.
12, 2011) (rejecting a class settlement that permitted "class counsel [to] seek[ ] an unopposed
award roughly four times greater than the actual and expected payout to the class (approximately
$4 million compared to approximately $1 million").  The court therefore concludes that the first
sign of collusion noted in *Bluetooth* is not present here.

The second of the signs of collusion, however, is – the parties' settlement agreement
contains an explicit "clear sailing" provision.[89]  "In general, a clear sailing agreement is one
where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting
court so long as the award falls beneath a negotiated ceiling."  *Weinberger v. Great Northern
Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991).  The parties' agreement states:

> "Class Counsel will request fees and expenses up to and not exceeding the total
> amount of Five Hundred Twenty Five Thousand Dollars ($525,000).  Toys will not
> object to a request for this amount of attorneys' fees and expenses."[90]

Clear sailing provisions are troubling on several levels.  "[T]he very existence of a clear
sailing provision increases the likelihood that class counsel will have bargained away something
of value to the class."  *In re Bluetooth*, 654 F.3d at 948 (citation omitted); *see also Malchman v.
Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J., concurring) ("It is unlikely that a
defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without
obtaining something in return.  That something will normally be at the expense of the plaintiff
class"), abrogated on other grounds in *Amchem*, 521 U.S. at 619.  "Such a clause deprives the
court of the advantages of the adversary process.  The source of the proposed payment renders

---

[89]*Id.*

[90]*Id.*

28

it improbable that class members will come forward to challenge the reasonableness of the requested fee.  Meanwhile, the payor is bound by contract not to contest the application." *Weinberger*, 925 F.2d at 525.

Here, despite the clear sailing provision, the class stands to receive a monetary award greater than it might have received had the case proceeded to trial.  As the Ninth Circuit has noted, moreover, the inference of collusion drawn from a clear sailing provision is reduced when the agreement lacks a reversionary or "kicker provision."  *In re Bluetooth*, 654 F.3d at 949 ("For this same reason, a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of collusion already suggested by a clear sailing provision. . . .  The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees").  The absence of a "kicker provision" in the parties' settlement and the fact that the class is receiving reasonable value reduces the likelihood that plaintiffs and Toys colluded to confer benefits on each other at the expense of class members.

While clear sailing agreements must be scrutinized to ensure that they do not result in unfair awards of attorneys' fees, see *Weinberger*, 925 F.2d at 523 ("[T]he approval function has routinely been extended to embrace fees, whether or not pre-negotiated, in those cases where the plaintiffs' attorneys are to be paid out of a common fund (and where, consequently, there is an inherent tension between the interests of the class and the interests of the lawyers)"), the court concludes that the provision at issue here does not raise an inference of collusion that warrants invalidation of the class settlement as a whole.  Rather, the court considers the nature of the attorneys' fees provision in evaluating the reasonableness of the fees sought, so as to ensure that class members have been afforded adequate relief, and that the fees their lawyers receive are proportionate to the value of the classes' recovery.

### k.      Balancing the Factors

"Ultimately, the district court's determination [concerning the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations

and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.* Having considered the relevant factors, the court concludes that the circumstances surrounding the settlement weigh in favor of a finding that it is fair and adequate. Additionally, all of the prerequisites to certification have remained satisfied since the court provisionally certified the settlement class on June 6, 2013.[91] The court accordingly certifies the settlement class and approves the settlement.

### B.   Motion for Attorneys' Fees, Costs, and Incentive Awards

The court now turns to class counsel's motion for fees, costs, and incentive payments. The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal Rules of Civil Procedure. While the rule specifies that requests shall be made by motion "unless the substantive law governing the action provides for the recovery of . . . fees as an element of damages to be proved at trial," the rule does not itself authorize the awarding of fees. "Rather, [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be another source of authority for such an award . . . [in order to] give[ ] effect to the 'American Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract authorizing such an award." *MRO Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999).

In class actions, statutory provisions and the common fund exception to the "American Rule" provide the authority for awarding attorneys' fees.[92] See Alba Conte and Herbert B. Newberg, NEWBERG ON CLASS ACTIONS, § 14.1 (4th ed. 2005) ("Two significant exceptions [to the "American Rule"] are statutory fee-shifting provisions and the equitable common-fund doctrine"). Rule 23(h) authorizes a court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." FED.R.CIV.PROC. 23(h). Under normal circumstances, once it is established that a party is entitled to attorneys' fees, "[i]t remains

---

[91]Prelim. Approval Order, ¶ 2.

[92]The common fund exception recognizes that attorneys' fees can be collected from a fund preserved, protected, collected or realized by attorneys' efforts on behalf of the class of persons benefitted by or entitled to the fund. See 38 A.L.R.3d 1384, § 4(a) & (b).

for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The parties' settlement agreement provides that Toys will not oppose an award of attorneys' fees and costs of as much as $525,000.[93]  It further provides for the payment of incentive awards of $5,000 to each of the three named plaintiffs.[94]

## 1.    Attorneys' Fees

Courts calculate attorneys' fees using either the lodestar or percentage-of-the-fund method.[95]  In a lodestar analysis, the court multiplies the number of hours reasonably expended by counsel on the matter by a reasonable hourly rate and adjusts the result upward or downward depending on a variety of factors.  In a percentage-of-the-fund analysis, the court awards a percentage of the class recovery as fees.  See *State of Florida v. Dunne*, 915 F.2d 542, 545 n. 3 (9th Cir. 1990).  "Though courts have discretion to choose which calculation method they use, their discretion must be exercised so as to achieve a reasonable result." *In re Bluetooth*, 654 F.3d

---

[93]Settlement Agreement, ¶ 2.6.

[94]*Id.*, ¶ 2.5.

[95]The court agrees with class counsel that this is not a coupon settlement as that term is used in the Class Action Fairness Act, 28 U.S.C. § 1712 ("CAFA").  CAFA provides that attorneys' fees awarded in connection with a class action coupon settlement must be based on the value to class members of redeemed coupons.  Here, the vouchers are not coupons "because [they] do[ ] not require class members to spend money in order to realize the settlement benefit." *Browning*, 2007 WL 4105971 at *5.  This is because there are more than 7,000 items available for purchase at Toys that cost less than $5 and because the vouchers are transferable, so that class members can sell them for money.  See also *Kearney v. Hyundai Motor Co.*, No. SACV 09–1298-JST (MLGx), 2013 WL 3287996, *7 n. 5 (C.D. Cal. June 28, 2013) ("A coupon settlement is one 'that provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant"); *Foos*, 2013 WL 5352969 at *2 ("The distinction between a coupon and a voucher is that a coupon is a *discount* on merchandise or services offered by the defendant and a voucher provides for *free* merchandise or services. . . .  A voucher is more like a gift card or cash [because it has] an actual cash value, is freely transferable and does not require class members to spend additional money in order to realize the benefits of the settlement.  There is no heightened level of scrutiny requirement [under CAFA] for vouchers. . . .  The Court concurs that the class members' ability to obtain $15.00 of free merchandise is a voucher because class members who opt for the $15 off merchandise certificate will have the opportunity to receive free merchandise, as opposed to merely discounted merchandise" (internal quotations and citation omitted)).

at 942 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997). As respects selection of the lodestar or percentage-of-the-fund method, the Ninth Circuit has observed:

> "Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances. Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'" *Dunne*, 915 F.2d at 545 (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

In cases where courts apply the percentage method to calculate fees, they should use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award. See *In re Bluetooth*, 654 F.3d at 943 (encouraging "comparison between the lodestar amount and a reasonable percentage award"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award"). By the same token, "a court applying the lodestar method to determine attorney's fees may use the percentage-of-the-fund analysis as a cross-check." *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)). "The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir. 1992). This is particularly true here, where, as noted, the parties have entered into a clear sailing agreement.

Class counsel ask that the court use the lodestar method because there is no common fund in this case.[96] The court concludes that using this method of calculating fees is appropriate under

---

[96]Fees Motion at 4.

1  the circumstances.  See *Hanlon*, 150 F.3d at 1029 (affirming the district court's choice of the

2  lodestar method where calculation of the common fund was uncertain); *Grays Harbor Adventist*

3  *Christian School*, 2008 WL 1901988 at *1 ("Where, as here, Settlement relief will be paid on a

4  claims made basis with no cap to the relief available, consideration of attorneys' fees lends itself

5  more readily to the lodestar method.  Because the attorneys' fees will be paid separately by

6  [defendant] without reducing the relief available to the Class, the lodestar method is appropriate").

7            **a.**     **Whether Class Counsel's Attorneys' Fees Request Is Reasonable**

8       The lodestar figure is "the number of hours reasonably expended on the litigation

9  multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  The lodestar "presumptively

10  provides an accurate measure of reasonable attorney's fees."  See *Harris v. Marhoefer*, 24 F.3d

11  16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  A court

12  may increase or decrease the lodestar amount in rare or exceptional cases.  See *Blum v. Stenson*,

13  465 U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91.  As the court

14  explained in *In re Bluetooth*:

15       "The court may adjust [the lodestar] upward or downward by an appropriate

16       positive or negative multiplier reflecting a host of reasonableness factors, including

17       the quality of representation, the benefit obtained for the class, the complexity and

18       novelty of the issues presented, and the risk of nonpayment.  Foremost among these

19       considerations, however, is the benefit obtained for the class.  Thus, where the

20       plaintiff has achieved only limited success, counting all hours expended on the

21       litigation – even those reasonably spent – may produce an excessive amount, and

22       the Supreme Court has instructed district courts to instead award only that amount

23       of fees that is reasonable in relation to the results obtained."  *In re Bluetooth*, 654

24       F.3d at 941-42.

25       Class counsel represent that their lodestar is $1,126,507.03, which they have reduced to

26  $457,993.54 given that Toys has agreed to pay no more than $525,000 in combined fees and costs

27

28

and their costs total $67,006.46.[97]

### i.    Reasonableness of Counsel's Hourly Rates

To assist the court in calculating the lodestar, a plaintiff must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895-96 n. 11.  The relevant community is that in which the district court sits.  See *Schwartz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995).  Declarations regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate.  See *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates).  See also *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which opined that "Earthquake's attorney rates were reasonable and customary").  Courts can also use survey data to evaluate the reasonableness of attorneys' rates.  See *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other reporting fees received by sixty-two firms doing a variety of work around the state.  The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the

---

[97]Fees Motion at 11.  Class counsel state that they will divide the ultimate attorneys' fees award among themselves so that Bock & Hatch, Anderson + Wanca, and Spiro Moore each receive 25% of the award, and the Linde Law Firm and Chant & Company split the remaining 25%.  (*Id*. at 3.)

reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for senior counsel and $105 to $115 per hour for junior counsel").

In calculating the lodestar, courts typically exclude time spent on clerical or ministerial tasks because such tasks are properly considered part of an attorney's overhead and are reflected in his or her hourly rate. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer] rate, regardless of who performs them"). Where support staff do substantive case-related work, however, fees for such work are recoverable. *Id.* at 285 ("Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar. Rather, the term must refer to a reasonable fee for the work product of an attorney. Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client"); *Earthquake Sound Corp.*, 352 F.3d at 1214-15 (affirming a lodestar-based fee award that included work performed by attorneys, paralegals, and clerks); *Grays Harbor Adventist Christian School*, 2008 WL 1901988 at *5 (accepting class counsel's lodestar calculation, which included fees for support staff, and noting that "if [the] recoverable lodestar were limited to attorney time, law firms would be inclined to assign low-level work to attorneys rather than legal support staff. The Ninth Circuit discourages such an inefficient result by recognizing the contributions of attorneys and non-attorneys").

Fourteen attorneys and five paralegals at five law firms represented the class in this case. They seek to have the court calculate fees using the following rates for attorneys at Spiro Moore LLP:[98] $600 per hour for partner J. Mark Moore (1995 graduate of UCLA School of Law); $325 per hour for associate Fernando Vicente (a graduate of Boston University School of Law admitted to the California bar in 2003); and $275 per hour for associate Rami Yomtov (a graduate of

---

[98]Where counsel have identified the law school from which they graduated and the number of years they have been in practice, or where the court has been able to determine this information from a state bar or firm website, it has noted the information in parenthesis.

Benjamin N. Cardozo School of Law at Yeshiva University admitted to practice in California in 2009).[99]   They seek an hourly rate of $550 for attorney Chant Yedalian of Chant & Company APLC (a Loyola Law School graduate with more than ten years of experience);[100] and $500 for principal Douglas Linde of the Linde Law Firm (a graduate of UCLA School of Law admitted to the California bar in 2001).[101]   They request that the court use the following rates for attorneys and a paralegal at Anderson + Wanca: $595 per hour for attorneys Brian Wanca (a 1979 graduate of Indiana University School of Law) and Ryan M. Kelly (a 1998 graduate of Loyola University Chicago School of Law), and $95 per hour for a paralegal.[102]   Finally, they seek the following rates for attorneys and paralegals at Bock & Hatch, LLC:  $595 for managing attorney Phillip A. Bock (a 1994 graduate of the University of Virginia School of Law) and of counsel Richard J. Doherty (a 1994 graduate of John Marshall Law School); $550 for attorney Tod A. Lewis (a 1998 honors graduate of Chicago-Kent College of Law); $515 for attorney James M. Smith (a 2005 graduate of John Marshall Law School); $495 for attorney Robert M. Hatch (a 1990 *cum laude* graduate of Wayne State University Law School); $410 for attorney Louis C. Ludwig (a 2007 graduate of Rutgers University School of Law); $220 for attorney Lisa M. Vandercruyssen; $195 for paralegal Matthew E. Bock; $150 for paralegal Aaron P. Schneider; $130 for paralegal Francis C. Vickers; and $125 for paralegal Dani E. Marler.[103]

As this summary indicates, class counsel request that the court find reasonable hourly rates for partners, principals, and managing attorneys of $595 (for attorneys with nineteen years of

---

[99]Moore Fees Decl., Exh. 1 (Lodestar Chart).

[100]Declaration of Chant Yedalian in Support of Motion for Attorneys' Fees ("Yedalian Decl."), Docket No. 146-3 (Aug. 9, 2013), ¶¶ 2, 5).

[101]Declaration of Douglas A. Linde in Support of Motion for Attorneys' Fees ("Linde Decl."), Docket No. 146-5 (Aug. 9, 2013, ¶ 3).

[102]Declaration of Brian J.Wanca in Support of Motion for Attorneys' Fees ("Wanca Decl."), Docket No. 146-4 (Aug. 9, 2013), Exh. C (Chart re: Hours Billed on *Ellis*).

[103]Doherty Decl., Exh. B (Lodestar Chart).

experience) and $600 (for a partner with 18 years of experience).  They seek hourly rates for other attorneys and associates that range from $220 (for an attorney with an unknown number of years in practice) to $595 (for an attorney with 34 years of experience).  And they request hourly rates for paralegals from $95 to $195.

As evidence that these rates are reasonable, class counsel proffer evidence regarding the attorneys' range of litigation and class action experience, and the experience of the law firms at which they work.  Moore, for example, provides a list of the class actions in which he has been appointed class counsel, and his curriculum vitae, which states that Spiro Moore has recovered more than $500 million on behalf of employees and consumers and that its appellate lawyers have achieved published victories in many cases, including *Bateman*.[104]  Yedalian states that he has "extensive experience in consumer related lawsuits, including complex cases, coordinated matters, multidistrict litigations and class actions and other representative suits," that he has been appointed class counsel "on several occasions in both federal and state courts," and that he has "extensive experience with cases, like the instant matter, which allege violations of the [FACTA]."[105]  He provides a list of FACTA class action cases in which he was able to certify a class and prosecute the matter to conclusion.[106]  Linde, for his part, states that the majority of his, and his firm's, practice involves intellectual property and class action litigation, that he has been appointed as lead counsel in many class actions in state and federal court, that he tried a class action to verdict, and that he has recovered more than $45 million for his clients.[107]  Wanca provides an eight-page list of class actions in which he has been appointed class counsel.[108]  Doherty provides a firm resume, which states that "[t]he firm's lawyers work exclusively on class actions pending throughout

---

[104]Moore Fees Decl., Exh. 3 (Moore Curriculum Vitae).

[105]Yedalian Decl., ¶¶ 6-8.

[106]*Id.*, ¶¶ 9-11.

[107]Linde Decl., ¶ 2.

[108]Wanca Decl., Exh. A.

Illinois and in several other states," and lists two pages of class actions in which the firm has been appointed class counsel.[109]  Bock's and Hatch's resumes include a two-and-a-half-page and three-page list of class actions in which they have represented clients, respectively.[110]

Class counsel also cite *Jarchaffian v. American Multi-Cinema, Inc.*, CV 09-03434 JHN (AJWx) (C.D. Cal. Oct. 6, 2011), in which the court found that Yedalian's requested rate of $500 was "consistent with the rate for an attorney of Class Counsel's experience."[111]  Other than this case, class counsel adduce no evidence that courts in this district have found their rates reasonable. Nor do they provide a survey or submit declarations attesting to the rates charged by attorneys with similar experience or law firms of similar size or expertise.  Rather, Moore states in conclusory fashion that class counsel's requested hourly rates "are similar to the rates charged by litigation firms in the Los Angeles legal community for complex litigation."[112]  Counsel cite to only one other case, *Browne v. American Honda Motor Co., Inc.*, No. CV 09–06750 MMM (DTBx), 2010 WL 9499073 (C.D. Cal. Oct. 5, 2010), which awarded fees to other class counsel in this district.  In *Browne*, this court found that a hourly rate of $545 was reasonable for an attorney who had been practicing in Los Angeles for 10 years, that $445 was reasonable for an attorney with 7 years of experience.  *Id.* at *7.

While class counsel have provided information concerning their background and experience, the only rates they offer for comparison purposes are those cited in *Browne* and *Jarchaffian*.  Although instructive, these cases do not demonstrate the reasonableness of all the rates class counsel propose, as some of the attorneys who worked on this matter have more than ten years of experience, while others appear to have less than seven years' experience. *Jarchaffian*, moreover,  does not address paralegal rates.  Accordingly, class counsel have failed

---

[109]Doherty Decl., Exh. A (Firm Resume at 2-3).

[110]*Id.* at 9.

[111]Fees Motion at 10.

[112]Moore Fees Decl., ¶ 5.

to meet their burden of showing that the hourly rates they request are reasonable.  When this type
of failure of proof occurs, the court may exercise its discretion to determine reasonable hourly
rates based on its experience and knowledge of prevailing rates in the community.  See, e.g., *Plan
Administrator v. Kienast*, No. 2:06-cv-1529, 2008 WL 1981637, *4 (W.D. Pa. May 2, 2008) ("If
a party fails to meet its burden to demonstrate a prima facie case that the requested rates were the
prevailing rates in the community, 'the district court must exercise its discretion in fixing a
reasonable hourly rate,'" quoting *Washington v. Philadelphia Court of Common Pleas*, 89 F.3d
1031, 1036 (3d Cir. 1996)); *Moreno v. Empire City Subway Co.*, No. CV 05-7768 (LMM)
(HBP), 2008 WL 793605, *7 (S.D.N.Y. Mar. 26, 2008) (where the fee applicant "has submitted
no evidence of the prevailing market rate for attorneys of like skill litigating cases similar to
plaintiff's . . . it is within [the court's] discretion to determine the reasonable hourly rate at which
plaintiff[']s counsel should be compensated based on [the court's] familiarity with plaintiff's case
and the prevailing rates in the [relevant community]"); *Shephard v. Dorsa*, No. CV 95-8748 ER
(JGx), 1998 WL 1799018, *2 (C.D. Cal. July 2, 1998) (determining a reasonable hourly rate
based on "(1) the Court's own experience in considering the prevailing market rates in Los
Angeles, (2) other fee awards in the relevant market, and (3) [the] ALTMAN WEIL, PENSA, SURVEY
OF LAW FIRM ECONOMICS (1996)" in a case where the fee applicant failed to establish the
reasonableness of the lawyer's hourly rate).

Based on its general knowledge of rates in the Los Angeles legal community for attorneys
of comparable skill and experience, the court concludes that the hourly rates requested for
partners, associates, and paralegals are reasonable.  See *Kearney*, 2013 WL 3287996, *8
(approving hourly rates between $650 and $800 for class counsel in a consumer class action);
*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172 (C.D. Cal. 2010) (approving
hourly rates between $445 and $675 for class counsel in consumer class action); see also *POM
Wonderful, LLC v. Purely Juice, Inc.,* No. CV 07-2633, 2008 WL 4351842, *4 (C.D. Cal. Sept.
22, 2008) (finding rates of $475 to $750 for partners and $275 to $425 for associates reasonable
in consumer class action); see also *Craft v. County of San Bernardino*, 624 F.Supp.2d 1113, 1122
(C.D. Cal. 2008) (finding a $225 rate reasonable for paralegals); *Vasquez*, 2011 WL 3320482 at

*2 (finding $210 and $200 rates reasonable for paralegals); *Bernal v. Paradigm Talent & Literary Agency*, 1:09–CV–00463–OWW–SKO, 2010 WL 6397561, *5, 7 (C.D. Cal. June 1, 2010) (finding a paralegal rate of $225 reasonable); *L.A. Printex Indus., Inc. v. William Carter Co.*, No. CV 09–2449–JFW (FMOx), 2010 WL 4916634 *2-3 (C.D. Cal. Dec. 1, 2010) (using paralegal rates of $229.50 and $202.50 to calculate fees).

### ii.    Reasonableness of the Hours Expended

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation. *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary"). "[T]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of th[e] hours worked. . . .'" *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992)); see also *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"); *Gucci Am., Inc. v. Pieta*, No. CV 04-9626 ABC (Mcx), 2006 WL 4725707, *2 (C.D. Cal. July 17, 2006) (holding that, although a fee applicant "is not required to record in great detail how each minute of [his] time was expended . . . [he must] list[ ] [the] hours and identify[ ] the general subject matter of [the] time expenditures"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorney's time must be documented; they do, however, require that there be adequate description of how the time was spent, whether it be on research or some other aspect of the litigation. . .").

Class counsel report that they have spent 2,076 hours litigating this case since its inception in 2006, or approximately 25 hours per month.[113] They assert that their services were "reasonably

---

[113]Fees Motion at 6. See Moore Fees Decl., ¶¶ 4-5 (noting that he estimates that his records do not include at least 25% of the hours actually devoted to this case because of his oversights and failures in the record-keeping process); Doherty Decl., ¶ 6; Yedalian Decl., ¶ 2; Linde Decl., ¶ 3; Wanca Decl., ¶ 5.

provided in the hard-fought course of this long-running multidistrict litigation,"[114] and contend they expended this amount of time because "throughout these proceedings, class certification was vigorously contested and opposed by Toys."[115]   Class counsel have provided time records supporting their fee request, in which they list the hours, types of activity, and general subjects on which they expended time.   The records reflect that counsel bill in increments of 5 or 10 minutes, reflecting the practice of the particular firm in question.

Moore provided a billing summary showing that he has billed 652.7 hours on the case since its inception seven years ago; that Vicente, an associate who left Spiro Moore in 2007, billed 80.7 hours; and that Yomtov, an associate who left the firm in 2010, billed 9 hours.   This equates to 7.77 hours per month.   Moore states that Vicente and Yomtov primarily assisted with document review and research.[116]   He states that he performed legal research, drafted discovery and subpoenas, prepared discovery responses, drafted and edited motions to compel discovery as well as responses and replies in connection with defendant's discovery-related submissions, reviewed discovery produced by defendants, deposed defendant's expert and virtually all of defendant's deponents, defended plaintiffs Edwards and Schley at their depositions, prepared motions to strike or exclude, argued nearly all of the substantive motions, and participated in several of the settlement negotiations and mediations.[117]   He also states that he regularly conferred with other class counsel in an effort to minimize duplication of effort and was the main point of contact between the plaintiffs and defendant's attorneys.[118]   Moore states that he also took primary responsibility for drafting nearly all of the documents filed in this litigation until the parties

[114]Fees Motion at 6-7.

[115]*Id.* at 8.

[116]Moore Decl., ¶ 3.

[117]*Id.*

[118]*Id.*

reached a settlement agreement, at which time Doherty's firm assumed drafting responsibilities.[119] Moore reports that he spent many more than the requested 652.7 hours on this case, but stopped recording hours when he realized the court would not likely grant fees for all hours billed.[120]

Yedalian's time records show that he billed 371.5 hours from December 25, 2006 to August 2, 2013, or about 4.42 hours per month.[121]  Most of Yedalian's time was devoted to discovery, email communication, and strategizing with other class lawyers about motions and settlement.  He also spent approximately 40 hours preparing for and attending the hearing before the Judicial Panel on Multidistrict Litigation ("MDL"), and approximately 29.10 hours drafting, reviewing, and commenting on the class certification brief, and drafting his declaration.

Linde's time records reveal that he billed 132.25 hours from March 2007 to August 2011, or approximately 2.54 hours per month.[122]  Linde reports that he worked many more hours on the matter, but did not bill for tasks that took less than 15 minutes, work performed in a group with other class counsel (e.g., telephone calls to strategize about the case), and work performed after August 2011, when it "became clear" that he would not be able to recover his actual fees even if he recorded all of his time.[123]  Linde's records show that he billed 74 hours reviewing defendant's document production.[124]  He spent the balance of his time preparing opposition to defendant's motion for summary judgment, taking a deposition, revising a sur-reply to the summary judgment motion, writing an *ex parte* application, revising the motion for class certification, reviewing cases

---

[119]Supplemental Declaration of Class Counsel J. Mark Moore ("Supp. Moore Decl."), Docket No. 153 (Nov. 3, 2013), ¶ 13.

[120]*Id.*

[121]Yedalian Report - *In Camera and Under Seal* ("Yedalian Report"), Docket No. 156 (Nov. 4, 2013).

[122]Supplemental Declaration of Douglas A. Linde in Support of Motion for Attorneys' Fees ("Supp. Linde Decl."), Docket No. 154 (Nov. 5, 2013), Exh. A (Time Records).

[123]*Id.*, ¶ 3.

[124]*Id.*, Exh. A (Time Records).

involving the MDL, and participating in settlement negotiations.[125]

Wanca's time records show that his firm billed 141.2 hours from June 26, 2008 to January 25, 2013, or about 2.61 hours per month.[126]  Wanca and Kelly spent approximately 53.4 hours on discovery, which included drafting interrogatories and requests for document production, and reviewing documents. [127]  They spent approximately 17 hours drafting a motion to lift the stay.[128]  The balance of their time was spent on legal research, strategy sessions with class counsel, and court appearances.[129]

Finally, the time records Doherty has submitted for work done by attorneys at Bock & Hatch show that the firm billed 820.9 hours from 2008 to 2013, or approximately 13.68 hours per month.  Doherty, Smith, and Ludwig did the bulk of this work: Doherty billed 202.2 hours, Smith billed 184.3 hours, and Ludwig billed 164.3 hours.[130]  The firm billed approximately 80 hours assessing and developing the case, 202 hours on discovery, 306 hours on pretrial pleadings and motions, and 233 hours on settlement.[131]

The court has reviewed the time records submitted, and finds that the overall number of

---

[125]*Id.*

[126]Wanca Decl., ¶ 5, Exh. B (Time Records).

[127]Wanca Decl., Exh. B (Time Records).

[128]*Id.*

[129]*Id.*

[130]Doherty Report - *In Camera and Under Seal* ("Doherty Report"), Docket No. 157 (Nov. 4, 2013); Doherty Decl., ¶ 6.

[131]Doherty Report.  Doherty submitted a breakdown of his firm's time, which included the total dollar amount billed by each attorney in each task category; it did not, however, include the total amount of time the attorneys spent on each category.  The court calculated the approximate number of hours expended by the attorneys by dividing each attorney's total dollar billings per category by the hourly rate reported for that attorney.  It estimated the total number of hours spent by the firm on each category of work by calculating its average hourly billing rate (by dividing its total dollar billing of $425,041.00 by its total hours billed of 820.9) and dividing the total dollar billings per category by this average hourly billing rate.

hours requested by class counsel is reasonable.  It does not appear that counsel engaged in duplicative or excessive billing.  The time records do not show, for example, that they spent inordinate amounts of time reviewing or editing each other's work.  Where multiple counsel worked on a motion, it appears that one counsel took the lead in drafting the motion, and one or two others drafted or edited small portions of the motion that were relevant to their particular clients' case and prepared supporting declarations.  This is not a case in which class counsel designated a co-author at each law firm to participate in drafting each pleading submitted, multiplying the number of billed hours by the number of law firms representing plaintiffs.  See *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("The court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work"); *Campon v. City of Blue Springs, Missouri*, 289 F.3d 546, 553 (8th Cir. 2002) ("In our view, it should not take four experienced, highly paid attorneys 480 hours to prepare one summary judgment motion and to prepare for and conduct a four-day trial when all pretrial discovery had been completed").

The court is familiar with the quality and length of class counsel's motions, moreover, and does not believe that they billed an excessive number of hours for researching and drafting their briefs.  The motion for class certification, for example, was 21 pages.  Class counsel's time records show that Bock & Hatch was the primary drafter of the motion; Smith billed approximately 18 hours working on it, while Ludwig billed approximately 21 hours.  Yedalian also worked on the motion, billing about 29.10 hours.  The time records of the other class counsel do not seek fees for time spent on the motion.  Class counsel therefore spent a total of 68.1 hours researching, writing, and editing the motion, or just over 3 hours per page.  While the case was not particularly complex, this amount of time is reasonable given the quality and length of the motion.

The court also notes that counsel spent a great deal of time on discovery, much of which was billed prior to the commencement of MDL proceedings.  Of the balance, much was spent

filing meritorious discovery motions.[132]  Moreover, although the number of hours billed for issues related to mediation and settlement is high, the court is cognizant of the lengthy mediation process in this case, due in part to factors outside class counsel's control (e.g., defendant's failure to appear for multiple mediation sessions).  Although most of the attorneys representing the class billed for telephone calls and emails in which they strategized with other class counsel, which would have been unnecessary had there been fewer law firms involved, the court declines to reduce counsel's requested hours because counsel have represented that the hours requested fall far short of the actual number of hours counsel expended on the case over the last seven years. Given the protracted nature of discovery and settlement discussions, moreover, the court finds 2,076 total hours reasonable.

### iii.   Calculation of the Lodestar Figure

For the reasons stated, the court concludes that the rates and hours requested by class counsel are reasonable.  Multiplying the number of hours expended by the attorneys' hourly rates yields a lodestar of $1,126,507.03.

### iv.   Whether the Court Should Adjust the Fee Award

Once the court has determined the lodestar, it should consider whether an award of that magnitude is reasonable, taking into account "'the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *In re Bluetooth*, 654 F.3d at 941-42 (quoting *Hanlon*, 150 F.3d at 1029).  In this case, none of these factors favors either an upward or downward departure from the lodestar figure.  As the Ninth Circuit has made clear, the most important factor is the benefit obtained for the class.  *Id.* at 942; see also *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (the ultimate reasonableness of the fee "is determined primarily by reference to the level of success achieved by the plaintiff"); see also *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1046 (N.D. Cal. 2008) ("The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award").

---

[132]See e.g., Order Granting Plaintiff's Discovery Motions, Docket No. 87 (July 29, 2010).

Class counsel "believe the proposed settlement is a fair, adequate and reasonable one under all the circumstances."[133]  The court agrees that the result is a positive one.  Class members will be able to obtain products from Toys that compensate them for the invasion of their privacy; they can receive the $5-$30 vouchers even if they cannot locate a receipt for their purchase(s). Although class members will not receive direct monetary compensation, they will be given something of value.  Compromise is an inherent part of the settlement process, and the fact that the settlement provides a voucher rather than cash does not reflect a poor outcome for the class, especially given the fact that class members risked recovering no damages if the case had proceeded and the class had been unable to prove willfulness.

Moreover, class counsel filed successful discovery motions and a successful motion for class certification.  See *In re Heritage Bond Litigation*, 02-ML-1475-DT (RCx), 2005 WL 1594389, *10 (C.D. Cal. June 10, 2005) (finding a fee that represented 33% of the common fund appropriate in part because the case was "marked by extensive motion practice," including successful motions for class certification and partial summary judgment); compare *Lo v. Oxnard Euro. Motors, LLC*, No. 11CV1009 JLS (MDD), 2012 WL 1932283, *3 (S.D. Cal. May 29, 2012) (expressing concern "over awarding attorneys' fees in excess of twenty-five percent of the settlement fund given the short duration of the action and the fact that the complaint appears to be a boilerplate complaint that Plaintiff's counsel need only amend slightly in each case it files alleging a TCPA violation, of which there are many").  Given the factual difficulties the class faced proving its claims – specifically the prospect that it would not be able to recover statutory damages because it would not be able to show that Toys acted willfully – the court believes the settlement represents a significant recovery.  See *Vizcaino*, 290 F.3d at 1048 (a substantial risk that the class would not recover supported the district court's conclusion that the results achieved by class counsel were exceptional).  Because the settlement conferred a significant benefit on class members, the court declines to adjust the fee award downward.

---

[133]Declaration of J. Mark Moore in Support of Motion for Preliminary Approval ("Moore Prelim. Decl."), Docket No. 142-1 (May 13, 2013), ¶ 5.

### b.       The Percentage-of-the-Fund Cross-Check

As noted, because the settlement agreement does not create a common fund, the percentage-of-the-fund method is an inappropriate method of calculating fees in this case. Nonetheless, it is instructive to determine what percentage of the value of the class settlement the fees counsel seek represent. See *Grays Harbor Adventist Christian Sch.*, 2008 WL 1901988 at *5 ("[A] court applying the lodestar method to determine attorney's fees may use the percentage-of-the-fund analysis as a cross-check," citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)). As noted, Toys' estimated settlement liability is $65.25 million to $391.5 million. Class counsel's requested fee of $457,993.54 represents .70% of the total value; the negotiated $525,000 cap equals .80%. As the court has noted, the number of class members who will actually receive notice of the settlement is unknown. If 400,000 people, which represents approximately three percent of the class, request $5 vouchers, the attorneys' fees sought would be approximately 22.9% of Toys' settlement liability.[134] This approximates, albeit is slightly lower, than the 25% benchmark set by the Ninth Circuit for awards calculated according to the percentage-of-the-fund method. See *Fischel v. Equitable Life Assurance Society of the United States*, 307 F.3d 997, 1006 (9th Cir. 2002); see also *Pincay Investments Co. v. Covad Communications Group*, 90 Fed. Appx. 510, 511-12 (9th Cir. Feb. 18, 2004) (Unpub. Disp.) ("This court has established twenty-five percent as a benchmark in percentage-of-the-fund cases that can be adjusted upward or downward to account for any unusual circumstances presented by a particular case"); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir.

---

[134]Rust Consulting, a firm that provides class settlement administrative services, estimates that claims filing rates in consumer litigation range from two to twenty percent. The fact that class members will not receive cash, but vouchers, moreover, will likely result in a lower number of claims filed. Similarly, because notice to the class was by publication in USA Today on two days, claims filing may be depressed. See Rust Consulting, Anticipating Claims Filing Rates in Class Action Settlements, http://www.rustconsulting.com /Legal_Sector_Knowledge_Sharing/ Articles_and_Publications/articleType/ArticleView/articleId/124/Anticipating_Claims_Filing_ Rates_in_Class_Action_Settlements.aspx (last visited December 15, 2013). For all of these reasons, a three percent claims filing rate appears to be appropriate. To the extent the rate is higher, of course, the fees requested by counsel will represent a smaller percentage of the value of the settlement.

1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("The benchmark percentage should be adjusted, or replaced by a lodestar calculation, [however,] when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). The percentage-of-the-fund cross-check, therefore, reveals that the determined fee is appropriate.

### c.    Conclusion Regarding Attorneys' Fees

For all of the reasons stated, the court finds class counsel's lodestar to be appropriate but reduces the fee award at their request to $458,602.54.[135]

### 2.    Whether Counsel's Request for Expenses is Reasonable

The district court must also determine an appropriate award of costs and expenses. See FED.R.CIV.PROC. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement"); *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985). One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and play surrogate client." See *In re Continental Illinois Securities Litig.*, 962 F.2d at 572. In keeping with this role, the court must examine prevailing rates and practices in the legal marketplace to assess the reasonableness of the costs sought. *Jenkins*, 491 U.S. at 286-87. "Expenses such as reimbursement for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, documents scanning, and visual equipment are typically recoverable." *Rutti v. Lojack Corp., Inc.*, No. SACV 06–350 DOC (JCx), 2012 WL 3151077, *12 (C.D. Cal. July 31, 2012). Courts also have discretion to reimburse consulting and expert witness fees. *In re Media Vision Technology Securities*

---

[135]As noted, class counsel requested $457,993.54 in attorneys' fees and $6,7006.46 in costs. Because the court determines, *infra*, that a $609.00 cost item is not reasonably awarded, it has reduced the cost award to $66,397.46. Because it found that class counsel's lodestar of $1,126,507.03 was reasonable, and reduced the fee award at their request, the court believes it is appropriate to award class counsel requested fees of $457,993.54 plus $609.00, for a total fee award of $458,602.54.

*Litigation*, 913 F.Supp. 1362 1366-67 (N.D. Cal. 1996).

Counsel seek $66,826.46 in expenses.[136]  With one exception, discussed *infra*, the court finds the expenses reasonable and concludes that the supporting documentation adequately confirms the expenditures.

Moore reports that Spiro Moore incurred $31,908.58 in expenses in connection with the litigation.[137]  Its expenses include filing fees; manual document filing; service of courtesy copies; service of process fees; court reporter deposition fees; expert consultation fees paid to Fraud Resource Group, LLC; messenger, postage, and delivery fees; fees for research done on Westlaw and Pacer; telephone expenses for conference calls; and travel.[138]

Yedalian requests $11,340.45 in unreimbursed expenses.[139]  The items include filing fees; investigative services' service of process fees; parking; mailing costs; expert fees; travel expenses; and mediation fees.[140]  Wanca requests $889.38 in unreimbursed costs.[141]  Included are reimbursement for delivery and messenger fees; a pro hac vice fee; filing fees; and service fees.[142] Wanca also seeks reimbursement for $429.00 in "court costs" and service fees for the case *Sanchez v. Toys 'R' Us-Delaware, Inc.*[143]  Because the *Sanchez* case was never before the court,

---

[136]Fees Motion at 11.  The court has subtracted $180 from this amount because Moore states in his supplemental declaration that the Expense Report attached as Exhibit 2 to his original declaration, which reflects a total unreimbursed expense amount of $32,088.58, is accurate with the exception of a $180 charge for attorney Ruth Seroussi's admission to the U.S. District Court. Seroussi not admitted in connection with this case.  (Supp. Moore Decl., ¶¶ 6, 8.)

[137]Moore Decl., Exh. 2 (Expense Report); Supp. Moore Decl., ¶¶ 6, 8.

[138]Supp. Moore Decl., Exh. 1 (Expense Report).

[139]Yedalian Decl., Exh. 1 (Expense Report).

[140]*Id.*

[141]Wanca Decl., Exh. C (Expense Report).

[142]*Id.*

[143]*Id.*

this expense is not reasonable and the court will deduct it in awarding costs.

Finally,[144] Doherty requests $22,688.05 in unreimbursed expenses.[145] At the hearing, Doherty proffered a redwell containing original documentation of costs, including invoices and copies of checks as well as a postage and copy log; these items were denominated Exhibits A through J, and were physically inspected by the court. Doherty represented that personnel at his firm verified that the expense report filed with his declaration accurately summarized the documentation in the folder. Doherty seeks reimbursement for fees charged by a process server; court reporter fees; expert witness fees; filing fees; mediator fees; postage and delivery fees; fees for research on Westlaw and Pacer; telephone and fax charges; travel expenses; and photocopying and binding.[146]

The court concludes that other than the $429.00 Wanca seeks for *Sanchez v. Toys 'R' Us*, the requested expenses are reasonable. They are the type of costs typically recovered in cases such as this. *Rutti,* 2012 WL 3151077 at *12. Nor do they reflect duplication by the various firms litigating this matter on behalf of the class. For example, although Moore's expense report lists $5,963.25 in consultant fees paid to Mari J. Frank and Fraud Resource Group, the memo line notes that half of the Frank fee and all of the Fraud Resource Group fee was to be reimbursed by Bock & Hatch. The report deducts this amount ($4,213.25) from the total expert expenses sought to reflect that Bock & Hatch reimbursed Spiro Moore in that amount.[147] Bock & Hatch seeks that amount in its request for reimbursement.[148] For these reasons, the court finds that the requested costs, minus the $429 *Sanchez* expense, are reasonable and awards counsel $66,397.46 in expenses.

---

[144]Linde did not support any request for costs to the court.

[145]Doherty Decl., Exh. C (Expense Report).

[146]*Id.*

[147]See Moore Decl., Exh. 2 (Expense Report).

[148]See Doherty Decl., Exh. C (Expense Report).

### 3.    Incentive Awards

An individual who joins his claims with those of a class "disclaim[s] any right to a preferred position in the settlement [of those claims]." *In re Oracle Securities Litigation*, No. C-90-0931-VRW, 1994 WL 502054, *1 (N.D. Cal. June 18, 1994) (quoting *Officers for Justice*, 688 F.2d at 632). Nonetheless, it is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions. See *In re Mego Financial Corp. Securities Litig.*, 213 F.3d at 463 (holding that the district court did not abuse its discretion in awarding an incentive award to the class representatives); *Matter of Continental Illinois Securities Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (stating that an incentive award in such amount "as may be necessary to induce [the class representative] to participate in the suit" is appropriate).

The settlement agreement provides for incentive payments of $5,000 to each named plaintiff.[149]  These proposed awards are consistent with the amount courts typically award as incentive payments. See, e.g., *In re Mego Financial Corp.*, 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC*, No. C06-04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646-47 (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking*, No. F04-6279 AWI LJO, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named

---

[149]Settlement Agreement, ¶ 2.5.

plaintiff).

Whether to authorize an incentive payment to a class representative is a matter within the court's discretion. The criteria courts consider in determining whether to approve an incentive award include:

> "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995).

### a. The Risk to the Class Representative in Commencing Suit

When a class representative shoulders some degree of personal risk in joining the litigation, such as workplace retaliation or financial liability, an incentive award is especially important. See *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (noting that fear of workplace retaliation is a relevant factor in evaluating the propriety of an incentive award). The record contains no information suggesting that plaintiffs risked retaliation or financial liability by filing these suits. Accordingly, the court concludes that this factor is neutral.

### b. The Notoriety and Personal Difficulties Encountered by the Class Representative

There is no particular notoriety associated with this litigation, nor is there any indication that the named plaintiffs have been subjected to media attention as a result of their involvement in the case. See, e.g., *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 WL 3854963, *13 (C.D. Cal. Aug. 13, 2008) (finding that the media attention class representatives attracted supported incentive awards). The fact that there was no media attention, however, does not preclude approval of an incentive payment. See *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR, 2006 WL 3312024, *4 (D. Or. Nov. 13, 2006) (approving an incentive award of $10,000 despite a lack of notoriety or demonstration of personal difficulties). As no significant media attention or other difficulties have been identified, however, this factor weighs against

authorizing a large incentive payment.

c.    **The Amount of Time and Effort Expended by the Class Representatives**

An incentive award is appropriate where the "class representatives remained fully involved and expended considerable time and energy during the course of the litigation." *Razilov*, 2006 WL 331204 at *4.  Class counsel assert that the class representatives

> "were subjected to intrusive discovery, including inquiries into the financial and other personal aspects of their li[ves].  Each of them regularly and consistently communicated with Class Counsel . . . throughout the years this lawsuit was pending.  Each of them reviewed relevant pleadings and documents, provided their input, and otherwise kept apprised of litigation related events and developments. Each also provided their respective ideas and input to Class Counsel in the rounds of negotiations and exchanges that preceded and followed that first mediation, including discussions leading up to the second mediation and the many discussions that followed.  Each also participated in the process to finalize the written settlement terms and documents, and the post-agreement phases that followed."[150]

Because plaintiffs expended reasonable efforts on the litigation and were involved in the proceedings, this factor weighs in favor of making incentive awards to them.  See *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *17 (N.D. Cal. Apr. 22, 2010) (approving a $20,000 award where plaintiff "made herself available for deposition on two separate occasions, wherein she was subjected to questioning regarding her personal financial affairs and other sensitive subjects; met with Class Counsel on six separate occasions; attended the full-day Court-ordered appraisal hearing; spoke with Class Counsel and their staff on many occasions; reviewed all major pleadings; and repeatedly responded to interrogatories and document requests); *In re Heritage Bond Litigation*, No. 02–ML–1475 DT, 2005 WL 1594403 *14 (C.D. Cal. June 10, 2005) (activities such as "responding to discovery, preparing for,

---

[150]*Id*. at 12-13, citing Moore Fees Decl., ¶ 8; Doherty Decl., ¶ 9.

traveling to and attending their depositions and maintaining contact with Plaintiffs' counsel to monitor the litigation" gave rise to an inference that class representatives were "actively involved in every aspect of . . . litigation").

### d.        The Duration of the Litigation

When litigation has been protracted, an incentive award is especially appropriate.  See *Van Vranken*, 901 F.Supp. at 299 (finding that a class representative's participation through "years of litigation" supported an incentive award).  *Edwards* was filed December 21, 2006,[151] and *Ellis* was filed May 21, 2008.[152]  The case has thus been pending for almost seven years.  Given the length of the litigation and plaintiffs' involvement in it, the court concludes that this factor favors an incentive award.

### e.        The Personal Benefit Enjoyed by the Class Representative as a Result of the Litigation

An incentive award may be appropriate when a class representative will not gain any benefit beyond that he would receive as an ordinary class member.  See *Razilov*, 2006 WL 331204 at *4 (approving the payment of an incentive award where the only benefit a class representative was going to receive from a settlement was the same statutory damages other class members would receive); *Van Vranken*, 901 F.Supp at 299 (where a class representative's claim made up "only a tiny fraction of the common fund," a substantial incentive award was appropriate).  The named plaintiffs in this action will receive no relief beyond that available to members of the class in general; absent an incentive award, they will each be eligible to submit a claim for a $5, $15, or $30 voucher.[153]  This factor, therefore, also favors approval of an incentive award.

### f.        Weighing the Factors

Considering all relevant factors, the court concludes that an incentive award of $5,000 for each of Edwards, Schley, and Ellis is "just and reasonable under the circumstances."  *Van*

---

[151]*Edwards* Complaint, CV 06-8163 MMM (FMOx), Docket No. 1 (Dec. 10, 2010).

[152]*Ellis* Complaint, CV 08-6645 MMM (FMOx), Docket No. 1 (May 21, 2008).

[153]Settlement Agreement, ¶¶ 2.4.1, 2.5.

1    *Vranken*, 901 F.Supp at 299.

2

3                              **III. CONCLUSION**

4          For the reasons stated, the court grants the motion for final approval of the settlement.  It

5    awards each named plaintiff a $5,000 incentive award, and awards class counsel $458,602.54.

6    in attorneys' fees and $66,397.46 in expenses, for a total award of $525,000.00.

7

8    DATED: January 17, 2014

                                          _____
9                                              MARGARET M. MORROW
                                          UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            55